Affirmed and Memorandum Opinion filed June 30, 2009














Affirmed and Opinion filed June 30, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00953-CV

_______________

 

LOWE=S HOME CENTERS, INC. and NATASHA TANNER, Appellants

 

V.

 

GSW MARKETING, INC. f/k/a SALESMAKERS, INC. d/b/a CSA
SERVICES SOUTHWEST and SNOW MOUNTAIN CONSTRUCTION, INC., Appellees

                                                                                                                                               


On Appeal from the 333rd District Court

Harris County, Texas

Trial Court Cause No. 2004-13253

        
                                                                                                                                       

 

O P I N I O N

 

In this negligent activity and
premises liability case, Natasha Tanner asserts claims for the injuries she
received when a tank fell from a toilet mounted on an elevated display in a
home improvement store and struck her.  She asserted claims against the
company that built the display on which the toilet originally had been mounted,
and the company that contracted to maintain the display from which the toilet
actually fell.  Because Tanner produced no evidence that either company
had a duty to discover that the toilet itself was incorrectly assembled, we
affirm the trial court=s judgment. 

I. 
Factual and Procedural Background

Appellant Natasha Tanner brought this
action to recover for injuries she received in the course and scope of her
employment by appellant Lowe=s Home Centers, Inc. (ALowe=s@) and for which she received workers= compensation benefits; Lowe=s intervened to assert its
subrogation rights.  This suit arises from injuries Tanner sustained on
April 12, 2003 when a toilet tank fell from an elevated display and struck her
on the head.  According to Tanner and Lowe=s, the events leading to her injury
began two years earlier.  We discuss these events as described in the
summary-judgment record and in accordance with the applicable standard of
review, discussed infra. 

A.       
Snow Mountain and Southpro
Displays

Lowe=s agreed to sell and display toilets
manufactured by American Standard, Inc.  To that end, Lowe=s hired appellee
Snow Mountain  Construction, Inc. (ASnow Mountain@) to construct a display for its new Pasadena store during the
period of time from April 5, 2001 to May 18, 2001.  Snow Mountain did not
design the display or supply materials for its construction, but instead
received the materials from the display manufacturer and installed it in
accordance with a Aplanogram@ supplied by Lowe=s.  While Snow Mountain
performed carpentry work, other vendors assembled the toilets.  

 

Because the planogram
called for the toilets to be attached to an angled, elevated display, the
entity responsible for assembling the toilet was required to attach the lid to
the tank with silicone.   The unidentified vendor then placed the
assembled toilets in front of the display until Snow Mountain
employees installed them.  Although not required to do so, Snow Mountain=s owner Stanley Barker instructed his
workers to move or push the tank to check that toilet bowl moved with it. 
Snow Mountain was not asked to check the nuts
and bolts installed by the vendor who assembled the toilets, and Barker did not
ask his employees to do so; they simply checked to see if each toilet moved as
a single unit before attempting to lift and mount it to the display. 
After the toilets were installed, Snow
 Mountain=s involvement
ended.     

American Standard also hired
contractors to maintain its displays, and the contractor could subcontract the
work to another independent contractor.  In July 2002,  Covington
Sales & Services, Inc. d/b/a Service Express a/k/a Southpro
Sales, Inc. (ASouthpro@) was responsible for maintaining the
toilet display in the Pasadena Lowe=s store.  Southpro
directed an independent contractor,  David
Freeman d/b/a Freeman Sets & Service, to remove the toilets from the Snow Mountain
display and reset them on a display built by Freeman or Southpro
(the ASouthpro Display@).

B.       
Maintenance of the Southpro Display

In a separate arrangement, American
Standard also verbally agreed to employ CSA Services, Inc. (ACSA@) to Aassist [American Standard] with maintenance
of displays and setting displays in stores . . . .@  CSA hired
another company, Salesmakers, Inc.  (ASalesmakers@), n/k/a GSW Marketing,
Inc., to perform the actual work.  

CSA provided training and instruction
to Salesmakers on how displays were to be
maintained.  When servicing the displays, Salesmakers= employees answered a set of
questions on a Acall sheet@ that, according to CSA, Awould lead our guys through, as well as a
Lowe=s store, to make sure that the stores
were set properly, set to CSA, Lowe=s and the manufacturer=s standards, and to document that,
when we walked out of the store, that everything was in saleable and in good
working order.@  A Lowe=s employee was also asked to review the call sheet, verify
that the display maintenance work was done, and sign the sheet. 

 

On March 21st, 2003, a Salesmakers employee visited the Pasadena store and completed a call sheet,
which was signed by Lowe=s employee Natasha Tanner.  On April 12, 2003, the tank
of one of the displayed toilets separated from the bowl and fell from the
elevated display, striking Tanner.  It appeared from subsequent
investigation that the toilet was incorrectly assembled at the time of the
accident.  If the toilet had been assembled in accordance with the
manufacturer=s instructions, then a bolt would have been inserted inside the toilet
tank, passing through a rubber washer before it emerged from the bottom of the
tank.  The bolt would have continued through a pre-drilled hole in the top
of the toilet bowl and exited from the underside of the bowl, where it would
have been secured by a metal washer and a nut.  It instead appeared that
the metal washer was not used, and the rubber washer was used in its place
between the underside of the toilet bowl and the nut.  According to Tanner
and Lowe=s, the tank fell when its weight
pulled the rubber washer and nut through the pre-drilled hole in the toilet
bowl, allowing the tank and the bowl to separate.

C.       
The Lawsuit

Tanner collected workers= compensation from Lowe=s and sued American Standard, Snow Mountain,
Southpro, Freeman, CSA, and Salesmakers;
Lowe=s intervened to assert its
subrogation claim.  All of the defendants moved for summary
judgment.  As relevant to this appeal, Salesmakers
moved for traditional summary judgment on Tanner=s claims of negligent activity and
premises liability on the ground that it had no duty to inspect the connection
between the toilet tank and the toilet bowl, which remained affixed to the
display.   Salesmakers also moved for
no-evidence summary judgment.  With regard to the premises-liability
claim, Salemakers argued there was no evidence that
(1) it was the possessor of the premises, (2) a condition on the
premises posed an unreasonable risk of harm, (3) Salesmakers
knew or reasonably should have known of the danger, (4) it breached its
duty of ordinary care by both failing to adequately warn of the condition and
failing to make the condition reasonably safe, and (5) Salesmakers= breach proximately caused Tanner=s damages.  As to Tanner=s negligence claim, Salesmakers asserted there was no evidence that (1) it
owed Tanner a legal duty, (2) it breached the duty, (3) the breach
proximately caused Tanner=s injury, and (5) Tanner suffered damages.  

Snow Mountain moved for no-evidence summary
judgment, arguing there was no evidence (1) that it had a duty to inspect
and maintain the display, (2) that it breached a duty to properly mount the
toilet or construct the display, and (3) of causation.

 

The trial court denied the
traditional and no-evidence summary-judgment motions filed by Southpro, CSA, and Freeman and granted summary judgment to
American Standard, Snow
 Mountain, and Salesmakers.  Lowe=s and Tanner then non-suited their
claims against CSA and Southpro with prejudice,
settled with Freeman, and now appeal the judgment in favor of Snow Mountain and
Salesmakers.[1] 
Due to the identity of their interests, we refer to both appellants
collectively as ATanner@ except where the context otherwise
requires.

II.  Issues Presented

In two issues, Tanner contends that
the trial court erred in granting summary judgment in favor of Snow Mountain
and Salesmakers.

III.  Standard of Review

We review summary judgments de novo,  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex.
2005), and where the trial court grants the judgment without specifying the
grounds, we affirm the summary judgment if any of the grounds presented are
meritorious.  FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872B73 (Tex.
2000).  We consider all grounds the appellant preserves
for review that are necessary for final disposition of the appeal.  Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 626 (Tex. 1996). 

 

In a traditional motion for summary
judgment, the movant has the burden of showing that
there is no genuine issue of material fact and it is entitled to judgment as a
matter of law.  Tex. R. Civ. P. 166a(c); Am.
Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997).  To be
entitled to traditional summary judgment, a defendant must conclusively negate
at least one essential element of each of the plaintiff=s causes of action or conclusively establish each element of an affirmative defense.  Sci.
Spectrum, Inc. v. Martinez, 941 S.W.2d 910,
911 (Tex.
1997).  Evidence is conclusive only if reasonable people could not
differ in their conclusions.  City of Keller v. Wilson, 168
S.W.3d 802, 816 (Tex.
2005).  Once the defendant establishes its right
to summary judgment as a matter of law, the burden shifts to the plaintiff to
present evidence raising a genuine issue of material fact.  See
City of Houston
v. Clear Creek
Basin Auth., 589 S.W.2d 671, 678B79 (Tex. 1979).

In a no‑evidence summary
judgment, the movant represents that there is no
evidence of one or more essential elements of the claims for which the non‑movant bears the burden of proof at trial.  Tex. R. Civ. P. 166a(i); Green v. Lowe=s Home Ctrs.,
Inc., 199 S.W.3d
514, 518 (Tex. App.CHouston
[1st Dist.] 2006, pet. denied).  We sustain a no‑evidence summary
judgment when (a) there is a complete absence of evidence of a vital fact, (b)
the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact, (c) the evidence offered to prove
a vital fact is no more than a mere scintilla, or (d) the evidence conclusively
establishes the opposite of the vital fact.  Merrell Dow Pharms.,
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  ALess than a scintilla of evidence exists
when the evidence is >so weak as to do no more than create a mere surmise or
suspicion= of a fact.@ 
King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex.
2003) (quoting Kindred v. Con/Chem, Inc., 650
S.W.2d 61, 63 (Tex.
1983)).

IV.  Analysis

 

Tanner sued both Snow Mountain
and Salesmakers on the same two theories of liability: 
negligent activity and premises liability, also known as premises defect. 
See Clayton
W. Williams, Jr., Inc. v. Olivo, 952 S.W.2d 523, 527 (Tex. 1997). 
To recover on a negligent-activity theory, Tanner was required to prove that
she was injured by or as a contemporaneous result of the defendant=s activity rather than by a condition
created by the activity.  Keetch v. Kroger Co., 845 S.W.2d 262, 264 (Tex. 1992).  In response to the appellees= respective motions for no-evidence summary judgment, Tanner
produced no evidence that Snow
 Mountain or Salesmakers was engaged in ongoing activities on the
premises at the time she was injured.  Thus, the trial court properly
granted summary judgment in favor of both appellees
on Tanner=s negligent-activity claim.  See id. (holding
that the trial court properly refused to submit a negligent-activity
instruction to the jury in the absence of evidence that the defendant was
engaged in an ongoing activity at the time of injury).  We therefore
overrule both of Tanner=s
issues regarding this cause of action, and affirm summary judgment in favor of Snow Mountain
and Salesmakers as to the negligent-activity claim.

Tanner=s remaining claims of premises
liability required proof, with regard to each defendant, of the following
elements: (1) actual or constructive knowledge of some condition on the
premises by the owner/operator, (2) the condition posed an unreasonable risk of
harm, (3) the owner/operator did not exercise reasonable care to reduce or
eliminate the risk, and (4) the owner/operator=s failure to use such care
proximately caused her injuries.  See id. (citing
Corbin v. Safeway Stores, Inc., 648 S.W.2d 292, 296 (Tex. 1983)).

A.       
Snow Mountain

1.        
Contractual Duties 

 

Tanner first contends that the trial
court erred in granting Snow
 Mountain=s motion for no-evidence summary
judgment regarding her premises-defect claims.  In support of this
position, she analogizes Snow
 Mountain to a general
contractor, and citing Redinger v. Living,
Inc.[2]
and Clayton W. Williams, Jr., Inc. v. Olivo,[3] argues that A[i]f a
contractor retains >some= right of control over the activity creating the premises
defect, it will owe a duty to warn others of the defect.@  She further points out that A[i]t is
typically the general contractor=s right of control over the injury‑causing
activity or condition that gives rise to a duty to ensure that the independent
contractor performs its work safely.@  See Clayton W. Williams,
Jr., 952 S.W.2d at 528.  Here, the injury-causing condition was the
incorrectly-attached tank of the toilet; as Tanner=s expert attested, Athe American Standard tank fell on Natasha
Tanner because there was no metal washer between the nut and bowl in the
tank/bowl connection.@ 
Thus, Tanner was required to prove that Snow Mountain retained the right to
control the work of the unidentified person or vendor in assembling the toilet
or otherwise adding or removing connections between the toilet tank and bowl.

A plaintiff can prove the right to
control by evidence of a contractual agreement that explicitly assigns the
possessor that right.  Coastal Marine Serv. of Tex., Inc. v. Lawrence, 988 S.W.2d 223, 226 (Tex. 1999).[4] 
Determining whether a contract provides a right of control is a question of
law.  See Lee Lewis Constr.,
Inc. v. Harrison, 70 S.W.3d 778, 783 (Tex. 2001). 
The control Amust relate to the manner in which the work is performed rather than
the quality of the result.@ 
Welch v. McDougal, 876 S.W.2d 218, 223 (Tex. App.CAmarillo 1994, writ
denied).  Based on the italicized portions of the following provisions
found in the AGeneral Conditions@ section of Snow Mountain=s contract with Lowe=s, Tanner contends she produced more
than a scintilla of evidence that Snow Mountain had the requisite contractual
right of control:

3.         Working
Conditions.  The Contractor [i.e., Snow Mountain] hereby warrants and
represents that he has inspected the job site and is familiar with
all working conditions which exists [sic] there, including subsurface
conditions, and that he has made due allowance for such conditions in his price
calculation and estimate of time for completion, to include overtime and/or
night work.

 

 

4.         Conduct
of the Work.  Contractor will diligently prosecute the Work, providing
sufficient manpower and tools at all times to assure completion of the Work in
an orderly fashion by the completion date.  All materials, prefabrication
and supplies shall be provided by Owner [i.e., Lowe=s].  If additional supplies are needed,
Contractor shall notify Owner, in writing, and materials will be sourced as
soon as possible.  Contractor shall at all times keep the job site
reasonably neat and clean and upon completion shall remove and dispose of all
rubbish, trash and refuse from the Work site and leave the job site broom clean
daily.  If Work site is not cleaned or remains in poor condition after
Work is complete, Contractor may be debited charges for cleaning or repairing
Work site.

 

The Parties
agree that the Contractor=s relationship with the Owner is that of an independent contractor . . . . The Parties
further agree that the Owner is interested only in the results obtained by the
Contractor under this Agreement and that the Contractor has sole control
over the manner and means by which it performs such obligations under this
Agreement; provided, however, that nothing within this Paragraph shall
supersede the Owner=s guarantee and inspection rights as set forth below. 
The Owner will not have control over, and will not be responsible for,
safety precautions and programs in connection with the Work, since these
are solely the Contractor=s responsibility as provided above.

5.         Guaranty
and Inspection.  Contractor guarantees that all labor provided for
the Work shall be of first quality, in full compliance with the
requirements of the Contract Documents and free from defect for a period of one
year from the completion of the Work. . . .

 

6.        
Safety.  The Contractor shall conduct the work in a safe and
prudent manner in compliance with all applicable safety laws, rules and
regulations.  The Contractor shall be responsible for initiating,
maintaining and supervising all safety precautions and programs in connection
with the performance of the Work.

Relying on these provisions, Tanner
argues that Snow Mountain owed a duty to her because it
was in control of the premises and in charge of safety.  

But the language on which she relies
does not support this position.  The agreement does not give Snow Mountain
possession or control over the premises, and it does not grant Snow Mountain
the right to control the manner in which any other contractor performs its
work.  To the contrary, it addresses only Snow Mountain=s performance of its own work,
defined as follows:

The Contractor shall provide all
labor and tools necessary to complete all work as per plans and
specifications.  Such performance shall be in accordance with the
Contract Documents and shall be referred to as the AWork[].@

 

(emphasis
added).  The Contract Documents consist of (a) the Construction
Agreement, (b) the General Conditions, (c) ASpecial Conditions and Carpentry List
printed in the Lowe=s Contractor Bid for Carpentry Work in New / Relo Store Setups,@ and (d) Lowe=s Plans and Specifications as
submitted prior to each project startup.  The summary-judgment record
contains only the first two documents, neither of which contains a requirement
that Snow Mountain supervise
or inspect the work of other contractors. 

As Stan Barker, Snow Mountain=s president testified, the company
was hired Ato do all the carpentry work in the store.@  The store identified in the
contract is the Lowe=s location in Pasadena.  Thus, the Pasadena store is the
Ajob site.@ 
It does not follow from Snow Mountain=s inspection of the store and its
familiarity with working conditions there that Snow Mountain also inspected and
was familiar with the quality of the connections between each display toilet=s individual components; moreover,
there is no evidence that the toilet at issue was even assembled at that time,[5] and thus, no
evidence that a dangerous condition was then in existence.  

 

There also is no evidence that Snow Mountain
had or exercised control over the person or entity responsible for assembling
the toilets.  Snow
 Mountain agreed to
inspect the job site, not the assembly of individual products, and agreed to
conduct its own work safely, not to ensure that other contractors did so as
well.  See Clayton W. Williams, Jr., 952 S.W.2d at 527B28 (A[A] general contractor normally has
no duty to ensure that an independent contractor performs its work in a safe
manner.@) (citing Exxon Corp. v. Quinn,
726 S.W.2d 17, 19B20 (Tex. 1987) and Abalos
v. Oil Dev. Co. of Tex., 544 S.W.2d 627, 631B32 (Tex. 1976)); Abalos,
544 S.W.2d at 631 (A[W]here the activity is conducted by, and is under the
control of, an independent contractor, and where the danger arises out of
[their] activity . . ., the responsibility or duty is that of
the independent contractor, and not that of the owner of the premises.@).  Snow Mountain
was hired to perform carpentry work, not plumbing work; it was required to
build and install a display and mount the assembled toilets onto it, but it did
not assemble the toilets. 

Tanner also argues that Snow Mountain
owed a duty to Tanner because it was in charge of safety.  We
disagree.  Snow Mountain=s safety obligations did not extend beyond its own work, and
it was responsible only for building a wooden display, installing the display
in the bay, and attaching the pre-assembled toilets to it.  The toilets
were moved to a different display nine months before Tanner=s accident, and there is no evidence
that Snow Mountain exercised any control over the
second display at any time.

2.        
Creation of a Dangerous Condition

Tanner also argues that in mounting
the display at an angle, Snow
 Mountain created a
dangerous condition by increasing the stress on the weak tank/bowl
connection.  Here, appellants argue that by doing precisely the job Snow Mountain
was hired to doCi.e.,
mounting the toilets at an angle as required by Lowe=sCit created a dangerous condition. 
Even assuming that Snow Mountain created a dangerous condition by building the
display and attaching the toilets to it as instructed, this was not the Adangerous condition@ that injured Tanner; to the
contrary, it is undisputed that the tank fell because a metal washer was
missing from the outside of the tank after the toilet was moved to a different
display, and in the washer=s absence, the bolt simply pulled the nut through the
bolt-hole.  Tanner cites no evidence to indicate that the washer was
omitted from the initial assembly rather than being removed during the reset or
at any other time, and there is no evidence that Snow Mountain
had or exercised control over the unknown assembler.  See IHS Cedars
Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,
143 S.W.3d 794, 799 (Tex. 2004) (A[C]ause in
fact is not established where the defendant=s negligence does no more than
furnish a condition which makes the injuries possible.@).  We therefore overrule the
remainder of Tanner=s first issue.




B.       
Salesmakers

Tanner next argues that the trial
court erred in granting Salesmakers=s motion for no-evidence summary
judgment on her claims of negligence and premises liability.  This theory
of liability is based on the Restatement (Second) of Torts, section 324A(b):

One who undertakes, gratuitously or for consideration,
to render services to another which he should recognize as necessary for the
protection of a third person or his things, is subject to liability to the
third person for physical harm resulting from his failure to exercise
reasonable care to protect his undertaking, if . . . 

. . .

(b)       he has undertaken to perform a duty owed by the other to the
third person . . . .

 

Tanner argues that Salesmakers Aspecifically undertook a duty owed by American
Standard, the owner of the toilets, to regularly inspect the toilets for
safety.  It was the job of [Salesmakers] to
inspect the toilets on a monthly basis and confirm that they were >safe and secure.=@  

But section 324A imposes a duty to
perform without negligence only the task that the actor has undertaken to
accomplish.  Although this rule expands the class of persons to whom the
duty of care is owed, it does not expand the scope of the undertaking. 
The Texas Supreme Court explained the source and nature of such a duty in Fox
v. Dallas Hotel Co.  111 Tex. 461,
473, 240 S.W. 517, 520B21 (1922), overruled on other grounds, Burk
Royalty Co. v. Walls, 616 S.W.2d 911 (Tex. 1981).  There, a company agreed
with a building tenant to maintain the elevators serving the tenant=s store, but due to the company=s negligence, store employee
Alexander Fox was killed.  Id. 
As the court explained:

 

 Upon defendant in error taking
over the control and repair of the elevators, to promote its own interests, it
became charged with the duty, declared in the instructions of the trial court,
to exercise ordinary care to maintain the elevators in a condition of
reasonable safety for use.  This duty to one using the elevators depended
in no wise on any contractual obligation in favor of the user from defendant in
error.  The duty is grounded on the obligation to exercise ordinary care
in an undertaking which cannot otherwise be carried on without endangering the
lives and limbs of others.  An elevator such as that in which Fox was
injured is a structure designed and maintained for use by human beings. 
Death or bodily harm to a fellow being is the natural consequence of failure to
keep the elevator in repair.  Having brought under its control a
mechanical appliance, which was, or should have been, known to be attended by
grave risks, defendant in error was under the specific, legal duty to exercise
ordinary care to protect those for whose use the appliance was provided against
the risks it foresaw or should have foreseen.

Id.  Here, however, there is no evidence that Salesmakers undertook to render services to CSA that Salesmakers should have recognized as necessary for the
protection of third persons.  This is most easily demonstrated by
examining the chain of delegated responsibilities from American Standard to Salesmakers. 

Tanner relied in part on the
deposition testimony of Christopher Brett Warren, American Standard=s former regional manager.  Warren testified that
American Standard sold the toilets to Lowe=s, and Lowe=s then generated a
Aplanogram@ showing where each toilet was to be
displayed.  American Standard then used independent service providers such
as CSA to maintain the displays, but the service provider=s function was to ensure that
merchandise was displayed in accordance with the planogram: 


Q:        How would
[you] know if - - how do you know if something is incorrect?

A:        Looking
at the pictures.

Q:        By
looking at the pictures, you can tell whether or not a certain toilet is
located in the right location; is that correct?

A:        Correct.

Q:        And if
you find that a toilet is incorrectly placed, you inform CSA Services, and
they, in turn, go and fix it; right?

A:        Correct.

Q:        That=s the extent of your review; is that correct?

A:       
Yes.

 

Although CSA was expected to display
the assembled toilets in a safe manner, American Standard did not delegate to
CSA any duty to inspect the toilets for correct assembly because American
Standard believed that the toilets were correctly assembled at the outset:

A:        We expect
that they, the service reps, display the products in a safe manner and, when
the job is complete, that those products are safely installed.

. . .

Q:        And you
want to make sure that each component of the toilets, the safety hazards that
we talked about, are also safe and secure; right?

A:        We expect
that that=s completed.

Q:        But you
don=t give any instructions to any of your service vendors
as to how they are to make sure that the toilets themselves are secure and
safe; is that correct?

A:        Correct.[[6]]

. . .

Q:        Based
upon this call sheet, is it the responsibility of CSA Services to check the
safety and security of American Standard displays each time they inspect an
American Standard display?

A:       
Yes.

. . .

Q:        And you
expected for them to spot anything obviously wrong, but you did not expect for
them to go back and make sure that the tank was originally assembled correctly?

A:       
Correct.

According to Warren, American
Standard=s management trained service
providers to understand the uses of its products, but did not provide any
training regarding safety.  In particular, Warren testified that American Standard had
never requested its service providers to verify that the actual washers are
present in the connection between the tank and the bowl, and it provided no
assembly instructions to inform its providers of how a toilet should be
correctly assembled.  

 

William Walter McConnell, III of CSA
similarly testified that Lowe=s provided the planogram but did
not provide instructions for assembling the toilets.  Like Warren at American
Standard, McConnell testified that CSA=s own employees were not required to
inspect the toilets to determine if the tank/bowl connection was secured by a
metal washer.  He explained that the connection would not be examined
unless the tank moved when a CSA employee touched the toilet while dusting it
or while placing or removing Astickers@ of price or product
information.  According to McConnell, CSA employees were asked to
determine only if the Atotal display@ was safe and secure, and not to
independently assess whether the toilets themselves were correctly
assembled.  Finally, but significantly, McConnell testified regarding CSA=s expectations of its own employees; Salesmakers, however, is an independent contractor.  

In support of her contention that Salesmakers owed her a duty, Tanner cites City of Denton
v. Page for the proposition that one who agrees to make safe a known,
dangerous condition of real property may be liable for the failure to remedy
the condition.  See 701 S.W.2d 831, 835 (Tex.
1986) (citing Gundolf v. Massman‑Johnson, 473 S.W.2d 70 (Tex. Civ. App.CBeaumont
1971), writ ref=d n.r.e., 484 S.W.2d 555 (Tex. 1972) ( per
curiam)).  In Page, however, the court
emphasized that this general rule applies if (a) the dangerous condition is
known,(b) the actor assumes control over the premises,
or (c) the actor assumes a duty to discover any dangerous condition existing on
the premises.  Id. at
834.  There is no evidence that a dangerous condition was known or
that Salesmakers assumed control of the premises, but
Tanner infers that Salesmakers assumed a duty to
discover any dangerous condition.

 

The strongest evidence that arguably
would support such an inference is the fourth page of the call sheet, which contains
the following parenthetical and question: A(It is imperative all displays are
safe and secure!)  Are all of the American Standard displays secured
properly?@ 
The term, Adisplays,@ however, is not ambiguous; it refers to the structure on
which the toilets are mounted.  Moreover, the parts of the toilets that
had been attached to the display remained affixed to it, and the display itself
remained secured to the bay.  There is no evidence that the display itselfCi.e., the structure built to display the toiletsCwas not secure, or
that the base of the toilet was not firmly affixed; rather, the toilet itself
came apart.  This question will not bear the strained interpretation that
it actually inquires into whether one part of the toilet is connected to another
part of the toilet in accordance with the assembly instructions.[7]  We
therefore overrule the remainder of Tanner=s second issue.

V. 
Conclusion

Having overruled each of the
appellants= issues, we affirm the judgment of the trial court.

 

 

 

 

/s/        Eva M.
Guzman

Justice

 

Panel consists of Justices Yates,
Guzman, and Sullivan. 














[1]  They have not appealed the judgment in favor of
American Standard.





[2]  689 S.W.2d 415, 417B18 (Tex. 1985).





[3]  952 S.W.2d at 528.





[4]   Tanner does  not
contend that Snow
 Mountain actually exercised
control.  Cf. id. (explaining that a party
can prove the existence of a right of control by evidence of explicit
assignment of the right or evidence that a control actually was exercised).





[5]  The effective date of the contract was March
16, 2001.  It was executed by Snow
Mountain=s principal on March 31, 2001, and it called for Snow Mountain
to perform its work from April 5, 2001 through May 18, 2001.





[6]  Objections omitted.





[7]  We also note that Tanner failed to argue
causation, and it is not presumed.  See John R.
Francis Bldg. Co. v. Bob Meador Co., 517 S.W.2d 693, 695 (Tex. Civ. App.CHouston
[14th Dist.] 1974, no writ).  She included the affidavit of Beryl Gamse in her summary-judgment evidence, and Gamse opines that Salesmakers was
Anegligent
in not detecting the improper connection at their first inspection after the
toilets were initially installed and/or after the reset.@  Nevertheless,
Tanner presented no evidence that the washer was missing as of the date of Salesmakers=s Afirst
inspection after the toilets were initially installed and/or after the reset.@